**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PRO-SPEC CORPORATION** | : | **CIVIL ACTION** |
| | : | |
| **vs.** | : | **NO. 16-4728** |
| | : | |
| **CHESTER WATER AUTHORITY,** *et al.* | : | |
| | : | |

**KEARNEY, J.**                                                                                          **June 28, 2017**

**<u>MEMORANDUM</u>**

Citizens may expect contractors awarded work from our water authorities following a competitive bid process will perform their contract obligations, including through subcontractors hoping to work for the contractor who won the bid from the water authority. We also expect the water authority and contractors act in accordance with their contract and commercial expectations just like a party to any contract. When the water authority, contractor and subcontractor each claim a failure in performance and ascribe a wide variety of disputed reasons, we cannot enter summary judgment on disputed issues of fact. After review of substantial discovery relating to the water authority's and a contractor's motion for summary judgment, we find certain claims must be dismissed as a matter of law. We cannot draw the same legal conclusions based on disputed facts relating principally to competing contract claims. Ferreting through several genuine issues of material fact, we need the adversarial process at trial to understand if there is a breach of contract and by whom.

I.       **Background[1]**

Chester Water Authority (the "Authority") delivers potable water to customers in Delaware and Chester Counties.[2] It owns and operates the Village Green Tank Farm. Water

tanks at the Tank Farm require periodic maintenance, and in the past, the Authority contracted with DN Tanks to work on the tanks.[3]

In December 2014, the Authority solicited bids for a contract relating to the "Rehabilitation of Village Green Tanks No. 2 and No. 9" (referred to as the "Tanks Contract").[4] Pro-Spec Corporation submitted the lowest bid for the Tanks Contract, and DN Tanks submitted the second lowest bid.[5]

On March 16, 2015, the Authority and Pro-Spec agreed to the Tanks Contract, which the parties agree is enforceable and governed by Pennsylvania law.[6] The underlying project is a public works project requiring Pro-Spec to recoat the exterior of Tank No. 9, install a line stop and two manholes at Tank No. 2, and apply an elastomeric coating membrane to areas within both tanks' interiors.[7] The Tanks Contract required DN Tanks or Preload install manholes.[8]

### A. Before Pro-Spec agrees to the Tanks Contract, it begins negotiating a subcontractor agreement with DN Tanks.

On January 9, 2015, DN Tanks sent an initial subcontractor proposal to Pro-Spec to install manholes and perform other work on the project.[9] Pro-Spec did not accept this proposal in writing and proceeded to agree to the Tanks Contract with the Authority on March 16, 2015 even though it lacked a subcontractor agreement with DN Tanks.[10]

Pro-Spec responded to DN Tanks' initial proposal on April 8, 2015 by sending a draft subcontractor agreement to DN Tanks, which contradicted many terms in DN Tank's initial proposal.[11] DN Tanks did not agree to these terms, and instead returned the draft subcontractor agreement with "proposed modifications" on April 29, 2015.[12] For example, DN Tanks proposed delaying the manhole installation start date by approximately three and a half months.[13] DN Tanks also demanded the agreement incorporate DN Tanks' initial proposal by reference.[14]

Pro-Spec responded it would never incorporate DN Tanks' initial proposal into a subcontractor agreement, calling this term a "deal breaker."[15]

During Pro-Spec's negotiations with DN Tanks, project engineer Gannett Flemming issued Pro-Spec a "Notice to Proceed" requiring Pro-Spec commence work on May 4, 2015.[16] The Tanks Contract required Pro-Spec to achieve substantial completion of all work by December 30, 2015, and final completion by January 29, 2016.[17] Pro-Spec admittedly did not complete the work by these deadlines, but the parties dispute whether Pro-Spec is responsible for not meeting the deadlines.[18]

### B. Pro-Spec and DN Tanks continue to negotiate the terms of the subcontractor agreement.

On April 30, 2015, Pro-Spec requested design submittals from DN Tanks.[19] DN Tanks responded it would not provide design submittals until the parties agreed to a subcontract.[20] On May 5, 2015, Pro-Spec sent DN Tanks a Letter of Intent requesting design submittals.[21] The cover email enclosing the Letter of Intent stated "issue[s] related to the Subcontract will proceed but should not delay the non-site work."[22] Pro-Spec President Ron Yarbrough acknowledged the parties were still negotiating "issues" concerning the subcontract.[23]

Pro-Spec's Letter of Intent did not include all of DN Tanks' proposed terms.[24] For example, the Letter of Intent did not incorporate by reference DN Tanks' initial proposal, and it required DN Tanks dispose of waste rather than Pro-Spec.[25]

On May 7, 2015, DN Tanks returned a marked-up copy of the Letter of Intent, which re-proposed DN Tanks' requested incorporation of the initial proposal and Pro-Spec's disposal of waste.[26] On May 11, 2015, Pro-Spec rejected DN Tanks' marked-up Letter of Intent, stating "I trust that an amicable subcontract will include any concerns of both parties and an amicable subcontract will be agreed to."[27]

On May 19, 2015, DN Tanks emailed Pro-Spec asking if it would send a revised Letter of Intent soon.[28]  On June 18, 2015, Pro-Spec asked DN Tanks if it would provide an executed subcontractor agreement.[29]  The following day, DN Tanks asked Pro-Spec to include its requirements into an acceptable subcontract, and DN Tanks reminded Pro-Spec they did not have an agreement.[30]  DN Tanks also worried the delayed start date would push DN Tanks' work into cold weather and Pro-Spec would need to make provisions to protect DN Tanks' work.[31]

As of June 19, 2015, DN Tanks and Pro-Spec still disagreed about incorporating DN Tanks' initial proposal by reference in the subcontractor agreement.[32]  On July 1, 2015, Pro-Spec sent DN Tanks a revised subcontractor agreement, but the proposed agreement failed to address many of DN Tanks' concerns and incorporate many of DN Tanks' material terms, including DN Tanks' initial proposal and its work schedule.[33]  DN Tanks responded by returning a list of its material terms to Pro-Spec on July 15, 2015.[34]  These terms included:

- Pro-Spec had not agreed to exempt DN Tanks from providing "permits, fees and inspections";
- Pro-Spec had not updated the schedule to match DN Tanks' most recent schedule;
- Pro-Spec had not incorporated DN Tanks' initial proposal by reference;
- Pro-Spec had not incorporated DN Tanks' most recent schedule by reference; and,
- Pro-Spec had not agreed it would bear the costs associated with protection of winter work.[35]

On July 23, 2015, Pro-Spec sent DN Tanks another proposed subcontract.[36]  On July 27, 2015, DN Tanks responded by calling the proposed subcontractor agreement unacceptable and again requested DN Tanks' material revisions be incorporated into the proposed subcontractor agreement.[37]

On July 28, 2015, Pro-Spec purported to send DN Tanks a Notice to Proceed even though it had not revised the subcontractor agreement to address DN Tanks' concerns.[38]  The same day,

DN Tanks responded by reminding Pro-Spec it did not agree to a subcontractor agreement and requested Pro-Spec correct several unacceptable provisions in the proposed agreement.[39]

### C. Pro-Spec claims to reach a subcontractor agreement with Preload.

On August 19, 2015, Pro-Spec wrote a letter to Gannett Fleming admitting it "just couldn't get a fair agreement with [DN Tanks] as a Subcontractor."[40] The same day, Pro-Spec informed Gannet Fleming it terminated its purported agreement with DN Tanks and issued a subcontractor agreement to Preload.[41]

On September 18, 2015, the Authority sent Pro-Spec a letter regarding Pro-Spec's delays, reminding them the Tanks Contract allows the owner to assess liquidated damages against Pro-Spec for late completion.[42] Pro-Spec forwarded this letter to Preload, threatening it would hold Preload responsible for all damages resulting from the delay.[43] Preload ultimately declined to enter a subcontractor agreement with Pro-Spec.[44]

### D. Pro-Spec reaches out to DN Tanks to reinstitute negotiations.

In October 2015, Pro-Spec approached DN Tanks regarding a subcontractor agreement.[45] On October 27, 2015, DN Tanks and Pro-Spec discussed necessary revisions to the subcontractor agreement.[46] On November 2, 2015, Pro-Spec sent DN Tanks another proposed subcontractor agreement.[47] The following day, DN Tanks responded by advising Pro-Spec certain agreed-upon revisions were not included in the recent draft subcontract.[48]

During November 2015, DN Tanks and Pro-Spec participated in several conference calls and exchanged several emails regarding the revisions to the subcontractor agreement.[49] On November 20, 2015, Pro-Spec and DN Tanks agreed to a subcontractor agreement.[50]

DN Tanks did not perform work or provide any deliverables to Pro-Spec before signing the agreement on November 20, 2015.[51]  DN Tanks and Pro-Spec did not have a course of dealing before this project because they did not work together in the past.[52]

### E.  DN Tanks performs under the subcontractor agreement.

On November 30, 2015, DN Tanks began work on the project.[53]  The November 20, 2015 subcontractor agreement between DN Tanks and Pro-Spec defined the scope of the work in Article 8, which refers to Schedule A and Schedule D.[54]  These Schedules explain the scope of the work is contained in "Bid Item B6."[55]  Despite this clear language, Pro-Spec president Ron Yarbrough testified DN Tanks' responsibilities are not limited to Bid Item B6, but are also found in the bid forms.[56]  Pro-Spec does not point to any contract language directing DN Tanks' responsibilities are included in the bid forms or elsewhere.  Nor does Pro-Spec identify DN Tanks' specific responsibilities encompassed in these documents.

DN Tanks' subcontract price for performing work under Contract Item B6 is $475,000.[57] DN Tanks invoiced Pro-Spec for this amount, but Pro-Spec paid only $137,250.[58]  On June 23, 2016, Pro-Spec submitted its Payment Application No. 11.[59]  Mr. Yarbrough signed Payment Application No. 11, and by doing so he represented to the owner, to the best of his knowledge, the work for each line item had been completed.[60]  Nevertheless, Pro-Spec submitted the expert report of Coatings Consultants, Inc., which found defects in DN Tanks' work.[61]

### F.  The Authority terminates the Tanks Contract with Pro-Spec.

On June 30, 2016, the Authority sent Pro-Spec a Termination Notice stating the Authority would end its agreement with Pro-Spec so the Authority could "correct the deficiencies of [Pro-Spec] and complete the work set forth in the Contract, including remediation

or corrective action required by the misapplication of the coating to the interior surfaces of Tank No. 2 by [Pro-Spec]."[62]

## II.     Analysis

Pro-Spec sued DN Tanks and the Authority for breach of contract and civil conspiracy, and brought an alternative claim against the Authority for unjust enrichment. The Authority counterclaimed for breach of contract and set-off. DN Tanks counterclaimed for, among other claims, breach of contract and set-off.[63]

DN Tanks and the Authority move for summary judgment, arguing Pro-Spec's claims fail as a matter of law.[64] DN Tanks also argues it is entitled to summary judgment on its breach of contract claim against Pro-Spec. We grant in part Defendants' motions, but find genuine issues of material fact preclude the entry of judgment on Pro-Spec's breach of contract claim against the Authority and DN Tanks' breach of contract claim against Pro-Spec.

### A.    Pro-Spec's breach of contract claim against the Authority must be resolved at trial.

The Authority is not entitled to summary judgment on Pro-Spec's claim for breach of contract. To succeed on its claim for breach of contract against the Authority, Pro-Spec must prove: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."[65] To prove damages, Pro-Spec "must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'"[66] This standard requires at least "a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor."[67]

The Authority argues Pro-Spec cannot prove damages to a reasonable certainty. We disagree. Pro-Spec's expert Mr. Versaw identified damages resulting from the alleged breach amounting to over $1.1 million.[68] We do not consider Mr. Versaw's testimony or expert report

because Pro-Spec failed to timely provide expert disclosures, and its belated disclosure is not substantially justified or harmless under Federal Rule of Civil Procedure 37(c)(1). Upon reviewing facts underlying Mr. Versaw's report demonstrating damages based on unpaid bills, we find Mr. Yarbrough may be competent to testify about breach of contract damages. Pro-Spec may proceed on its breach of contract claim against the Authority.

### B. We dismiss Pro-Spec's breach of contract claim against DN Tanks.

We grant summary judgment on Pro-Spec's claim against DN Tanks for breach of contract. The ordinary elements of offer, acceptance, and consideration apply in the context of a construction contract.[69] An acceptance of an offer "must be absolute and identical with the terms of the offer."[70] A purported acceptance "which adds qualifications or requires performance of conditions, is not an acceptance but is a counter-offer."[71]

Pro-Spec argues its breach of contract claim against DN Tanks arises from "DN [Tanks'] bad faith conduct in refusing to execute a subcontract," "demanding additional contract terms," and not working during the summer 2015 timeframe.[72] Its argument presupposes the existence of a subcontractor agreement requiring performance in the summer of 2015. Pro-Spec, however, provides no evidence it agreed with DN Tanks to a subcontractor agreement before November 20, 2015.

During the time period leading up to November 20, 2015, DN Tanks and Pro-Spec exchanged a series of offers and counteroffers. After DN Tanks submitted its initial proposal, Pro-Spec responded with a draft subcontractor agreement contradicting many of the initial proposal's terms. The parties continued this back-and-forth negotiation process for several months until they finally agreed to a subcontractor agreement on November 20, 2015. Even though the Authority required Pro-Spec sign a subcontractor agreement with DN Tanks or

Preload, DN Tanks had no contractual obligations until it agreed to the subcontractor agreement in November 2015. As Pro-Spec's breach of contract claim against DN Tanks is based on DN Tanks' conduct preceding November 20, 2015, we must grant summary judgment on this claim for lack of an agreement.

Pro-Spec abandoned its claim to the extent it could be based on alleged breaches of the November 20, 2015 subcontractor agreement occurring after November 20, 2015, as Pro-Spec fails to address these alleged breaches in its response.[73]

### C. We dismiss Pro-Spec's unjust enrichment claim.

We grant the Authority's motion for summary judgment on Pro-Spec's claim against the Authority for unjust enrichment. The "doctrine of unjust enrichment is inapplicable when the relationship between parties is founded on a written agreement or express contract."[74] As the Authority and Pro-Spec do not dispute a valid contract governs their relationship, we dismiss this claim.

### D. We dismiss Pro-Spec's civil conspiracy claim.

To prove a civil conspiracy, Pro-Spec must demonstrate (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage."[75] Pro-Spec must also prove "malice, *i.e.* an intent to injure."[76] Pro-Spec may prove a conspiracy through circumstantial evidence provided such evidence is "full, clear and satisfactory."[77] "Mere suspicion or the possibility of guilty connection is not sufficient, nor proof of acts which are equally consistent with innocence."[78]

"Absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act."[79] Stated another way, a conspiracy claim cannot be based

on dismissed claim, but instead must be based on a predicate cause of action in the lawsuit.[80] For example, courts have dismissed conspiracy-to-defame claims after finding no basis for the underlying defamation claim.[81]

Pro-Spec does not identify the underlying claim forming the basis of its conspiracy claim. Having dismissed Pro-Spec's breach of contract claim against DN Tanks and its unjust enrichment claim against the Authority, Pro-Spec's only remaining claim is for breach of contract against the Authority based on the Authority's failure to pay Pro-Spec under the Tanks Contract.[82] To the extent Pro-Spec's civil conspiracy claim is based on one of these dismissed claims, we dismiss its conspiracy claim because there is no remaining underlying cause of action.

We also dismiss Pro-Spec's conspiracy claim to the extent it is based Pro-Spec's breach of contract claim against the Authority for failure to pay. The initial problem with this theory of conspiracy liability is it is based on conduct unrelated to Pro-Spec's breach of contract theory against the Authority for failing to pay under the Tanks Contract. Pro-Spec characterizes its conspiracy claim as DN Tanks and the Authority's conspiracy to (a) delay Pro-Spec's progress on the project, and (b) have Pro-Spec terminated from the project.[83] These alleged conspiratorial acts have nothing to do with the theory of Pro-Spec's breach of contract claim against the Authority—failing to pay under the Tanks Contract. In other words, Pro-Spec does not plead or argue DN Tanks conspired with the Authority to refuse to pay Pro-Spec in breach of the Tanks Contract. Pro-Spec accordingly fails to maintain an underlying cause of action forming the basis of its conspiracy claim.

Alternatively, we dismiss the conspiracy claim because Pennsylvania law does not allow Pro-Spec to bring a claim for conspiracy to breach a contract, as the underlying claim must constitute a tort. We begin by stating the obvious: a breach of contract claim is not a tort.[84]

Although we are unaware of Pennsylvania case law requiring the underlying cause of action for a conspiracy claim constitute a tort, our court of appeals has consistently stated a conspiracy claim must be based on an "underlying tort."[85]  For example, in a 1999 multidistrict litigation case involving civil conspiracy claims under Pennsylvania law and other state laws, our court of appeals explained "[t]he established rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability."[86]  In 2000, our court of appeals acknowledged "Pennsylvania precedent that holds that a claim of civil conspiracy cannot be pled without also alleging an underlying tort."[87]  And again, in 2005, our court of appeals held, "A claim for civil conspiracy 'cannot be pled without also alleging an underlying tort.'"[88]  These decisions came up in different contexts did not specifically address whether one may sue for conspiracy to breach a contract, but we nonetheless find the unqualified language in these appellate decisions is binding on us.  We grant summary judgment on Pro-Spec's conspiracy claim against Defendants to the extent it is based on an underlying breach of contract claim.

Even if we were not bound by our court of appeals' unqualified language, we predict the Pennsylvania Supreme Court would prohibit a claim for conspiracy to breach a contract.  The Pennsylvania Supreme Court has long recognized a tort claim based on interference with contractual relations.[89]  The court in *Caskie* explained this tort claim derives from the contract itself, which both confers rights upon the parties and "imposes on all the world the duty of respecting that contractual obligation."[90]

This duty, however, does not impose unlimited tort liability.  The court in *Glazer v. Chandler* held a contract promisee may not sue the promisor for the tort of "inducing breach of contract or refusal to deal with third parties," but instead must resort to a breach of contract claim.[91]  In *Glazer*, the defendant agreed to sell building lots and related sewer connection rights

to the plaintiff, but later refused to go forward with the sale, resulting in the expiration of plaintiffs' sewer connection permits.[92]  The court found that while Pennsylvania law permits a plaintiff to sue a defendant for interfering with the plaintiff's agreement with a third party, the plaintiff-promisee could not sue the defendant-promisor in tort for what is essentially a breach of contract.[93]  The court explained:

> To permit a promisee to sue his promissor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our wellsettled forms of actions. Most courts have been cautious about permitting tort recovery for contractual breaches and we are in full accord with this policy. The methods of proof and the damages recoverable in actions for breach of contract are well established and need not be embellished by new procedures or new concepts which might tend to confuse both the bar and litigants.[94]

This ruling is consistent with the Pennsylvania Supreme Court's 2014 decision in *Bruno v. Erie Insurance Company*.  In *Bruno*, the court discussed over 200 years of jurisprudence on the gist of the action doctrine, which prohibits a tort claim which "is, in actuality, a claim for breach of contract."[95]  The court explained the doctrine precludes a tort claim when liability depends upon breach of a contractual duty, but not when liability depends on breach of a broader social duty existing outside of the contract.[96]

The principles announced in *Glazer* and *Bruno* prohibit a claim for conspiracy to breach a contract.  As civil conspiracy requires at least two actors, a claim for conspiracy to breach a contract necessarily requires at least one conspirator be a party to the contract, which in this case is the Authority.  Pro-Spec seeks tort relief against the Authority under a conspiracy claim for breaching its agreement with Pro-Spec.  But as the court in *Glazer* instructs, a contract promisee like Pro-Spec cannot sue the promisor in tort for what is essentially a breach of contract.  And under *Bruno*, the conspirator's tort claim would be barred by the gist of the action doctrine

because the conspiracy claim's underlying cause of action for breach of contract necessarily seeks relief arising from breach of a contractual duty, not breach of a broader social duty. We accordingly grant summary judgment in favor of the Authority and DN Tanks on Pro-Spec's conspiracy claim.

### E. DN Tanks' breach of contract and set-off claims against Pro-Spec.

We deny DN Tanks' motion for summary judgment on its claims for breach of contract against Pro-Spec. DN Tanks performed all work governed by the November 20, 2015 subcontractor agreement, yet Pro-Spec paid only $137,250 of the $475,000 total, leaving an outstanding sum of $337,750.

In its response to DN Tanks' statement of undisputed material facts, Pro-Spec argues DN Tanks did not perform all of the work under the November 20, 2015 subcontractor agreement because the scope of the work included work in the bid documents. Mr. Yarbrough testified the scope of DN Tanks' work could be found in the bid documents, but Pro-Spec did not identify the specific provision of the bid form expanding DN Tanks' work responsibilities. In contrast, the subcontractor agreement specifically references "Bid Item B6" as encompassing the scope of DN Tanks' work.[97]

"Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'"[98] If the parties' intent is clear, we must rely on the contents of the agreement alone.[99] In light of these settled principles, Mr. Yarbrough's testimony as to the scope of DN Tanks' work does not create a genuine dispute of material fact as to the scope of DN Tanks' work under the November 20, 2015 subcontractor agreement. The parties' intended obligations are encompassed in the written agreement, which identifies Bid Item B6 as encompassing the scope of DN Tanks' work. Pro-Spec fails to identify

a provision of the written subcontractor agreement which expands the scope of the subcontractor work to include unperformed work described in bid documents.

Although the scope of the work is not genuinely disputed, there is a genuine issue of material fact as to whether DN Tanks satisfactorily performed. Pro-Spec's expert, Coatings Consultants, Inc., submitted a report stating it found defects in DN Tanks' work. This creates a genuine dispute of material fact for trial as to DN Tanks' breach of contract claim against Pro-Spec.

We accordingly deny DN Tanks' motion for summary judgment as to its breach of contract claim against Pro-Spec.[100]

## III. Conclusion

We grant Defendants' motions for summary judgment as to Pro-Spec's civil conspiracy claims. We grant the Authority's motion for summary judgment on Pro-Spec's unjust enrichment claim against the Authority, but we deny the Authority's motion as to Pro-Spec's breach of contract claim. While we grant DN Tanks' motion for summary judgment as to Pro-Spec's breach of contract claim against DN Tanks, we deny DN Tanks' motion as to its breach of contract claim against Pro-Spec. We dismiss DN Tanks' set-off claim as moot.

The parties may proceed to trial on Pro-Spec's breach of contract claim against the Authority, the Authority's claims against Pro-Spec for breach of contract and set-off, DN Tanks' claims against Pro-Spec for breach of contract, *quantum meruit*, and violating the Pennsylvania Contractor and Subcontractor Payment Act,[101] and DN Tanks' claims against International Fidelity Insurance Company under a payment bond.

---

[1] In reviewing summary judgment motions, we consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to" Pro-Spec, "the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). Our Policies

require a Statement of Undisputed Material Facts be filed in support of a Rule 56 motion, as well as an appendix of exhibits. The Authority filed its Statement of Undisputed Material Facts at ECF Doc. No. 55-2. The Authority filed an appendix at ECF Doc. No. 56. DN Tanks filed its Statement of Undisputed Material Facts at ECF Doc. No. 53-2. DN Tanks filed an appendix at ECF Doc. No. 54. Pro-Spec responded to the Authority's Statement of Undisputed Material Facts at ECF Doc. No. 61. Pro-Spec responded to the DN Tanks' Statement of Undisputed Material Facts at ECF Doc. No. 62. Pro-Spec added documents to the Appendix at ECF Doc. Nos. 61-2 through 61-5. References to the exhibits in the appendices shall be referred to by party and bates number, for example, "DN Tanks Appx. 1."

[2] ECF Doc. No. 61, ¶ 1.

[3] ECF Doc. No. 18, ¶ 13.

[4] ECF Doc. No. 61, ¶ 3.

[5] ECF Doc. No. 61, ¶ 4; ECF Doc, No. 30, at p. 7.

[6] ECF Doc. No. 61, ¶¶ 5–7.

[7] ECF Doc. No. 61, ¶¶ 8–9.

[8] DN Tanks Appx. 168–69, at p. 37:14–38:05.

[9] ECF Doc. No. 62, ¶ 6; DN Tanks Appx. 96.

[10] ECF Doc. No. 62, ¶ 18; ECF Doc. No. 61, ¶¶ 5–7.

[11] ECF Doc. No. 62, ¶¶ 17, 19.

[12] ECF Doc. No. 62, ¶¶ 33, 39.

[13] ECF Doc. No. 62, ¶ 35.

[14] ECF Doc. No. 62, ¶ 34.

[15] ECF Doc. No. 62, ¶ 36–37.

[16] ECF Doc. No. 61, ¶¶ 10–11.

[17] ECF Doc. No. 61, ¶ 12.

[18] ECF Doc. No. 61, ¶ 13.

[19] ECF Doc. No. 62, ¶ 40.

[20] ECF Doc. No. 62, ¶ 41.

[21] ECF Doc. No. 62, ¶ 43.

[22] ECF Doc. No. 62, ¶ 44.

[23] ECF Doc. No. 62, ¶¶ 38, 45.

[24] ECF Doc. No. 62, ¶¶ 47, 49.

[25] ECF Doc. No. 62, ¶¶ 48–49.

[26] ECF Doc. No. 62, ¶ 50.

[27] ECF Doc. No. 62, ¶ 53.

[28] DN Tanks Appx. 246.

[29] DN Tanks Appx. 249.

[30] ECF Doc. No. 62, ¶¶ 56–57.

[31] ECF Doc. No. 62, ¶ 58.

[32] ECF Doc. No. 62, ¶ 59.

[33] ECF Doc. No. 62, ¶¶ 60–61.

[34] ECF Doc. No. 62, ¶ 62.

[35] ECF Doc. No. 62, ¶ 63.  Pro-Spec contends "these items were previously agreed to based upon the contract documents which were used for the bid as well as the prime contract between Pro-Spec and [the Authority]." ECF Doc. No. 62, ¶ 63.  Federal Rule of Civil Procedure 56(c)(1)(A) obligates Pro-Spec to support this assertion by "citing to particular parts of materials in the record."  Although Pro-Spec cites "Exhibit 'G', p. 33, Ln. 7-20," this citation does not support its assertion.  Pro-Spec does not cite the agreement between Pro-Spec and the Authority or DN Tanks' bid.  Under Rule 56(e)(2), we may accordingly consider DN Tanks' proposed fact in paragraph 63 undisputed for the purposes of this motion.

[36] ECF Doc. No. 62, ¶ 64.

[37] ECF Doc. No. 62, ¶¶ 67–68.

[38] ECF Doc. No. 62, ¶¶ 70–71.

[39] ECF Doc. No. 62, ¶ 72.

[40] DN Tanks Appx. 350.

[41] DN Tanks Appx. 352.

[42] ECF Doc. No. 62, ¶ 78.

[43] DN Tanks Appx. 357.

[44] ECF Doc. No. 62, ¶ 81.

[45] ECF Doc. No. 62, ¶ 82.

[46] ECF Doc. No. 62, ¶ 83.

[47] ECF Doc. No. 62, ¶ 85.

[48] ECF Doc. No. 62, ¶ 85.

[49] ECF Doc. No. 62, ¶ 87.

[50] ECF Doc. No. 30, at p. 8.

[51] ECF Doc. No. 62, ¶ 90.

[52] ECF Doc. No. 62, ¶ 91.

[53] ECF Doc. No. 62, ¶ 96.

[54] DN Tanks Appx. 46.

[55] DN Tanks Appx. 53, 56.

[56] DN Tanks Appx. 164, at pp. 19:01–20:11.

[57] ECF Doc. No. 62, ¶ 162.

[58] ECF Doc. No. 62, ¶¶ 163–64.

[59] ECF Doc. No. 62, ¶ 165.

[60] ECF Doc. No. 62, ¶¶ 166, 169; DN Tanks Appx. 491, at pp. 321:23–322:03.

[61] Pro-Spec Appx. 560.

[62] ECF Doc. No. 62, ¶ 105.

[63] DN Tanks also sued International Fidelity Insurance Company as third party defendant for a payment bond claim.

[64] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, "we view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 313 (3d Cir. 2016) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their care for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-323).

[65] *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002)).

[66] *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225–26 (3d Cir. 2003) (quoting *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 668 (3d Cir. 1998)).

[67] *Id.* at 226 (quoting *ATACS Corp.*, 155 F.3d at 669).

[68] Appx. 600.

[69] See *Hedden v. Lupinsky*, 176 A.2d 406 (Pa. 1962); *Ribarchak v. Mun. Auth. of City of Monongahela*, 44 A.3d 706, 708 (Pa. Commw. 2012).

[70] *Hedden*, 176 A.2d at 408 (citing *Cohn v. Penn Beverage Co. et al.*, 169 A. 768 (Pa. 1934)).

[71] *Id.* (quoting *Eastern Electric Sales Co. Inc., v. Provident Tradesmens Bank & Trust Co.*, 162 A.2d 215 (Pa. 1960); *see also Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc.*, 764 A.2d 587, 593 (Pa. Super. 2000).

[72] ECF Doc. No. 62-2, at p. 10.

[73] *See Cicchiello v. Beard*, 726 F. Supp. 2d 522, 531 (M.D. Pa. 2010); *Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003); *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 572 (E.D. Pa. 1999).

[74] *Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 896 (Pa. Super. 2011) (citation omitted).

[75] *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. 2008) (citation omitted).

[76] *Lackner v. Glosser*, 892 A.2d 21, 35 (Pa. Super. 2006) (citation omitted).

[77] *Scully v. US WATS, Inc.*, 238 F.3d 497, 516 (3d Cir. 2001) (quoting *Fife v. Great Atlantic & Pacific Tea Co.*, 52 A.2d 24, 27 (Pa. 1947)).

[78] *Id.* (citation omitted).

[79] *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. 2000) (citation omitted).

[80] *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000); *see also Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. 2008); *Pelagatti v. Cohen*, 536 A.2d 1337, 1342 (Pa. Super. 1987).

[81] *See Pelagatti*, 536 A.2d at 1342 (collecting cases).

[82] ECF Doc. No. 1, ¶¶ 36–45.

[83] ECF Doc. No. 62-2, at p. 11.

[84] See generally *Bruno v. Erie Ins. Co.*, 106 A.3d 48 (2014).

[85] *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999).

[86] *Id.*

[87] *Boyanowski*, 215 F.3d at 405.

[88] *McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005) (quoting *Boyanowski*, 215 F.3d at 405).

[89] *Caskie v. Philadelphia Rapid Transit Co.*, 184 A. 17, 18 (Pa. 1936).

[90] *Id.* (citation omitted).

[91] *Glazer v. Chandler*, 200 A.2d 416, 417–18 (Pa. 1964).

[92] *Id.* at 417.

[93] *Id.* at 418.

[94] *Id.* (internal citation omitted).

[95] *Bruno*, 106 A.3d at 60.

[96] *Id.* at 68.

[97] DN Tanks Appx. 53, 56.

[98] *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993)).

[99] *Id.*

[100] As Pro-Spec no longer has a breach of contract claim against DN Tanks, we dismiss DN Tanks' set-off claim as moot.

[101] 73 P.S. § 501 *et seq.*